Smith, J.
(dissenting). Because I believe the trial court abused its discretion in failing to insure that defendant was competent to stand trial and because I believe that an incompetent defendant may have been convicted of these brutal crimes, I dissent.
To rebut the defendant’s impending defense of “not responsible” by reason of mental disease or defect (Penal Law § 40.15), the People moved on the first day of trial to have defendant examined by a board-certified forensic psychiatrist of the People’s own selection (see, CPL 250.10 [3]). That motion was granted, and, on the evening following the second day of the trial, the People’s forensic psychiatrist, Dr. Lawrence Siegel, evaluated defendant with the goal of determining his mental state at the time of the crime. Dr. Siegel concluded that “[defendant’s] mental condition does not appear sufficiently stable to enable him to withstand the stresses of a trial without suffering a serious, prolonged or permanent breakdown. Based upon the examination he has deteriorated into a psychotic state.” Dr. Siegel further concluded, “Mr. Tortorici is currently exhibiting signs and symptoms of acute psychosis. He is incapable of rational participation in court proceedings. He requires hospitalization and treatment with medication to restore him *770 to fitness. * * * Based upon the information available at this time, it is my professional opinion with a reasonable degree of psychiatric certainty that Mr. Tortorici is not fit to proceed to trial.”
A defendant who lacks the mental capacity to stand trial and to aid in his or her defense cannot, in harmony with due process principles, be convicted in an American court of law (Pate v Robinson, 383 US 375; Bishop v United States, 350 US 961; Drope v Missouri, 420 US 162; People v Hudson, 19 NY2d 137, cert denied 398 US 944). Moreover, in New York it is the People who have the burden of proving by a fair preponderance of the evidence that the defendant is competent to stand trial (People v Christopher, 65 NY2d 417, 424-425). That burden, however, was not met here.
In New York, the determination as to whether to order a competency hearing is a matter left to the sound discretion of the trial court (People v Russell, 74 NY2d 901, 902). However, as articulated by this Court in People v Smyth (3 NY2d 184), the guiding principle remains: “If at any time before final judgment in a criminal action it shall appear to the court that there is reasonable ground for believing that a defendant is in such state of idiocy, imbecility or insanity that he is incapable of understanding the charge, indictment or proceedings or of making his defense, it is the duty of the court to direct him to be examined in these respects” (3 NY2d, at 187; see, People v Armlin, 37 NY2d 167, 171; People v Bangert, 22 NY2d 799, 800; People v Gonzalez, 20 NY2d 289, 293-294, cert denied 390 US 971; CPL 730.30 [1]). Furthermore, in such cases it is not sufficient for the trial court to rely upon the mere fact that the defendant is oriented as to time and place and has some recollection of events (Dusky v United States, 362 US 402). Instead, where a reasonable ground emerges, both due process and the precedent of this Court require that a hearing be held in strict compliance with the provisions of CPL article 730 (see, People v Armlin, 37 NY2d, supra, at 170-172; People v Smyth, 3 NY2d, supra, at 187).
In People v Morgan (87 NY2d 878, 879), this Court held that no abuse of trial court discretion — and therefore no Appellate Division error of law — occurred by the trial court’s refusal to grant defense counsel’s repeated requests for a “new or updated examination of defendant’s competency to stand trial.” There, prior to trial, defendant had been examined four different times over intervals of several months with the most recent finding of fitness having occurred some four months prior to the start *771 of the proceedings. The Court stated that “[t]he trial court was entitled to give weight to the findings and conclusions of competency derived from the most recent examination” (id., at 880). In the instant case, however, with the one and only determination of defendant’s competency to stand trial having occurred some 10 months prior to the start of the proceedings, any reliance upon Morgan is misplaced.
Following the tragic occurrence which began this criminal action, medical professionals within the Albany County mental health system determined, based upon court-ordered evaluations of defendant (see, CPL 730.30), that in the years prior to the incident, and continuing throughout the time of its occurrence, defendant suffered from a fixed delusional belief that a micro chip had been surgically implanted inside his head, that a police listening device had been surgically implanted inside his penis and that he was a target of governmental experimentation. Moreover, according to psychiatrists, these irrationally held beliefs were additionally complicated by defendant’s increasing suspicions of a vast governmental conspiracy, which, at least on one occasion, he attempted to uncover by undergoing a medically prescribed x-ray of his genitalia. The genesis of defendant’s delusional behavior, as psychiatrists reported, began with the combined effects of a traumatic childhood, a family history of alcoholism and suicide, parents embroiled in divorce and the eventual use, abuse and addiction in his own life of alcohol, drugs and narcotic substances.
After having examined defendant at some length following the incident, psychiatrists concluded that the incident itself was “the product of a longstanding mental disorder, most notably a paranoid delusional system.” Speaking of defendant, psychiatrists reported the following conclusions:
“He has ongoing capability to process information given him, the capacity to use that information but unfortunately incorporates most information given him into the delusional system regarding the media and government. With respect to this, his competency, which is a legal decision, is certainly in question. Although he knows all the appropriate roles of players for the courts and is of at least average intelligence, the impact the paranoid delusional system has may certainly impact on his relationship with his attorney and impede the ability to get at facts versus delusions. He is certainly in need of stabilization.”
*772 Based upon this and other similar evaluations, psychiatrists determined defendant to be an incapacitated person not competent to stand trial. As a result, on January 6, 1995, the court committed defendant to the Mid-Hudson Psychiatric Center for treatment and continued evaluation (see, CPL 730.40).
At Mid-Hudson, defendant underwent both individual and group counseling sessions, attended occupational and recreational therapy programs, and received alcohol and chemical abuse treatment in programs designed specifically for the mentally ill. Apparently, defendant derived benefit from his participation in these programs and, as a result, his condition improved. By February 28, 1995, after two months of receiving such care, defendant had exhibited such marked signs of psychiatric improvement that his doctors were then led to conclude that defendant was at that point competent to return to court. Thus, in a report dated March 3, 1995, psychiatrists certified defendant as “fit to proceed.” On March 20, 1995, defendant was discharged from Mid-Hudson and returned to the Albany County prison system. Having been diagnosed with alcohol abuse, cocaine-induced psychotic disorder with delusions, paranoid personality disorder and psychosocial stressors, however, psychiatrists warned that defendant should continue to receive supportive psychotherapy, as well as alcohol and chemical abuse treatment. Nothing in the record before us, however, demonstrates that either of these recommendations was adequately followed.
On March 7, 1995, four days after he was certified fit to proceed, defendant was indicted and thereafter arraigned some 13 days later. More than eight full months passed, however, until, on November 16, 1995, pre-trial hearings in the case began, with defendant waiving his right to be present at that time. Thereafter, following the passage of another IV2 months, on January 3, 1996, jury selection in the trial commenced — a total of approximately 10 months from the March 1995 date of defendant’s certification of fitness to proceed.
On the first day of trial, defendant again waived his right to be present, stating in a colloquy with the Judge: “Let me make this clear, please: This trial, the bad memory, it’s a nuisance to me. I want to have as little to do with these proceedings as possible.” The Trial Judge stated in response to defendant’s waiver:
“I want you to also be aware that at any point in *773 time, if I decide to waive your appearance — and that’s going to happen in a few moments * * * if you change your mind with regard to that — I’m going to instruct [your attorney] to periodically check on your situation — all you have to do is let the Sheriff deputies or [your attorney] know that you have changed your mind and wish to be present. I will immediately, upon hearing that, cease all proceedings in this matter until you are brought into the courtroom.”
Finding no abuse of discretion in Morgan (87 NY2d 878, 880, supra), this Court was expressly persuaded by the fact that the Trial Judge “saw the defendant actively participating in every aspect of his case, including a continuing flow of oral and written communications with his attorney,” and that “the Judge personally interacted with the defendant on several occasions, including plea discussions, in which the defendant evinced a particularized understanding of the nature of the proceedings and what was unfolding.” Similarly, in People v Gensler (72 NY2d 239, 245), this Court expressly found support for the trial court’s exercise of discretion based upon its “progressive personal observations of defendant.” Here, on the other hand, with defendant’s presence having been waived during both pretrial hearings and trial, any meaningful contact between defendant and the Trial Judge was minimal at best. Moreover, the trial record is undisputedly devoid of any indication that the trial court, after having received the nine-page communication from the People’s forensic psychiatrist, undertook any further contact, communication with, or observation of defendant prior to rendering its decision.*
Finally, with regard to the issue of defense counsel’s failure to request that a competency hearing be held, this too provides no sanctionable basis for the trial court’s conclusion. Akin to every criminal defendant’s unilateral rights to decide whether to proceed without the benefit of counsel, whether to énter a plea of guilty to the charge(s) or whether to offer his or her' testimony at trial, the fundamental right of the accused to be mentally competent at trial is a right which is individually *774 owned and unilaterally exercised by every criminal defendant, independent of any action by trial counsel. Thus, as a unilateral right of the accused, resting squarely upon Fourteenth Amendment due process grounds (see, Medina v California, 505 US 437; Drope v Missouri, 420 US 162, supra; Pate v Robinson, 383 US 375, supra), no amount of artifice, strategy or losing trial tactics by a defendant’s counsel may be said to diminish the duty of the trial court to adequately safeguard this fundamental constitutional concern (see, Pate v Robinson, supra, at 384 [“it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently ‘waive’ his right to have the court determine his capacity to stand trial”]).
In short, notwithstanding defense counsel’s failure to move for a competency hearing in this case, the nine-page communication from the People’s forensic psychiatrist — which concluded that defendant was “incapable of rational participation in court proceedings” — was sufficient to establish a reasonable ground to believe that defendant was incapable of understanding the charges or proceedings against him or of assisting in his defense (CPL 730.30 [1]; People v Smyth, 3 NY2d 184, 187, supra; People v Armlin, 37 NY2d 167, supra). As a result, the trial court was required, independent of any applicable statutes, to sua sponte order a further examination of defendant and, if necessary, a hearing on constitutional due process grounds. The failure of the trial court to do so was an abuse of discretion that warrants a reversal. Accordingly, I would reverse the order of the Appellate Division and remit this case for a new trial, presuming, of course, that defendant is first found fit to proceed (see, Pate v Robinson, 383 US 375, 378, supra; People v Gonzalez, 20 NY2d 289, 293-294, cert denied 390 US 971, supra).
Judges Bellacosa, Ciparick, Wesley and Rosenblatt concur with Chief Judge Kaye; Judge Smith dissents and votes to reverse in a separate opinion; Judge Levine taking no part.
Order affirmed.

 Not only does Dr. Siegel’s report raise an issue concerning defendant’s mental capacity to stand trial, it also raises questions about his capacity to waive his presence at the pre-trial hearing and at trial. Moreover, the bigoted tirade by the defendant at sentencing, a tirade cut off in its midst by the court, raised further questions concerning defendant’s capacity to participate in his trial.